UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

EDWARD C. FERGUSON, III,

                                    Petitioner,

                    v.                                                    9:21-CV-1122
                                                                          (MAD)

LYNN J. LILLEY,

                                    Respondent.

_____

APPEARANCES:                                  OF COUNSEL:

EDWARD C. FERGUSON, III
Petitioner, pro se
17-A-1764
Collins Correctional Facility
P.O. Box 340
Collins, NY 14034

HON. LETITIA JAMES                            MARGARET A. CIEPRISZ, ESQ.
Attorney for Respondent                       Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

MAE A. D'AGOSTINO
United States District Judge

**ORDER**

I.    **INTRODUCTION**

        Petitioner Edward C. Ferguson, III ("Petitioner") seeks federal habeas corpus

relief pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet.").  On October 15, 2021,

this action was administratively closed due to Petitioner's failure to properly commence

it.  Dkt. No. 2, Order Directing Administrative Closure.  Petitioner was advised if he

desired to pursue this action he must so notify the Court and, within thirty days of the Order, either (1) pay the filing fee of five dollars, or (2) submit a completed, signed, and properly certified in forma pauperis ("IFP") application.  *Id*. at 2.  Petitioner subsequently paid the filing fee and the case was reopened.  Dkt. No. 3, Letter; docket entry dated October 21, 2021 (identifying receipt information for the filing fee transaction); Dkt. No. 4, Text Order (restoring action to the Court's active docket).

Respondent successfully requested two extensions of time to file a response and permission to file an oversized memorandum of law.  Dkt. Nos. 7, 9, Letter Motions (requesting an extension of time); Dkt. No. 11, Letter Motion (requesting permission to file an oversized memorandum of law); Dkt. Nos. 8, 10, 12, Text Orders (granting requests).  Respondent filed a response.  Dkt. No. 13, Memorandum of Law in Opposition to Petition; Dkt. No. 14, Answer; Dkt. No. 15-1, State Court Record ("SR"); Dkt. No. 15-2, State Court Transcripts ("T").  Petitioner successfully requested three extensions of time to file a reply.  Dkt. Nos. 18, 20, 22, Letter Motions (requesting an extension of time); Dkt. Nos. 19, 21, 23, Text Orders (granting requests).  Petitioner submitted his reply.  Dkt. No. 26, Traverse.

## II.   RELEVANT BACKGROUND

### A.  Indictment

In an Indictment dated January 19, 2016, Petitioner was charged with: three counts of Aggravated Vehicular Homicide, in violation of N.Y. PENAL LAW ("P.L.") § 125.14(3); three counts of Aggravated Vehicular Homicide, in violation of P.L. § 125.14(5); Vehicular Manslaughter in the First Degree, in violation of P.L. § 125.13(3); Aggravated Vehicular Assault, in violation of P.L. § 120.04(a)(3); Vehicular Assault in

the First Degree, in violation of P.L. § 120.04(3); Manslaughter in the Second Degree, in violation of P.L. § 125.15(1); Assault in the Third Degree, in violation of P.L. § 120.00(2); Reckless Driving, in violation of N.Y. VEHICLE AND TRAFFIC LAW ("V.T.L.") § 1212; Driving While Intoxicated, in violation of V.T.L. § 1192(2); Driving While Intoxicated, in violation of V.T.L. § 1192(3); Driving While Impaired by the Combined Influence [of] Alcohol and Any Drug, in violation of V.T.L. § 1192(4)(a); Failure to Yield, in violation of V.T.L. § 1141; Moving from Lane Unsafely, in violation of V.T.L. § 1128(A); No Seat Belt, in violation of V.T.L. § 1229(c)(3); and Refusal to Submit to a Chemical Test, in violation of V.T.L. § 1194(1)(B).  *See* SR at 162-72, Indictment.  In a Special Information Charging a Predicate Offense Pursuant to N.Y. CRIMINAL PROCEDURE LAW ("C.P.L.") § 200.60, the District Attorney for Rensselaer County charged that Petitioner was previously convicted of Driving While Ability Impaired, in violation of V.T.L. § 1192(1), on May 9, 2009, and October 15, 2014.  SR 173.

**B. Pre-Trial Proceedings**

As relevant here, Petitioner was represented by Mr. Hannigan from July of 2016 through his jury trial in February of 2017.  *See* SR 44.  As discussed in greater detail below, on November 3, 2016, the People offered Petitioner a plea deal, under which Petitioner would plead guilty to "vehicular manslaughter in the first degree, a Class C felony, with a sentence agreement of five to 15 years in State Prison[.]"  SR 12-14.  Petitioner rejected the plea offer and the case proceeded to trial.  SR 14.

At a pre-trial conference conducted on January 30, 2017, Petitioner stipulated he had two prior convictions of Driving While Ability Impaired, in violation of V.T.L. § 1192(1), as charged in the Special Information.  SR 174-76.

### C.  Jury Trial

Petitioner's jury trial before Rensselaer County Court ("County Court" or "trial court") commenced on January 31, 2017.  *See generally*, T 2.[1]  A jury was selected, sworn in, and given preliminary instructions.  T 72-143.  The Assistant District Attorney ("A.D.A.") delivered the People's opening statement and defense counsel made a statement on Petitioner's behalf thereafter.  T 144-96.[2]  Only the facts and testimony relevant to the instant action will be further discussed.

#### 1.  The People's Case

William Shoemaker testified that on July 27, 2015, he and Christopher Sharpley drove Sharpley's black Nissan Altima from Nassau to the DMV and encountered Petitioner, a friend from high school, "walking down the road" on the way.  T 229-33.  Shoemaker stated Petitioner invited him and Sharpley to join him at a camp ground located "[o]ff of Old Route 66" in Nassau later.  T 235-37.  When the pair departed the DMV, Shoemaker drove with Sharpley to his mother's home to celebrate Sharpley's birthday, recalling they "stopped at Cubbies in Troy" on the way to purchase two "24 ounce . . . Twisted Tea Half and Half . . . malt beverage[s]."  T 237-39.  After the meal at Shoemaker's mother's home, Shoemaker drove to the camp ground– located approximately five minutes away– with Sharpley, stopping "[a]t the County Store on 66" on the way to purchase additional alcoholic beverages.  T 238-39.

---

[1] Petitioner's jury trial encompassed the fifteen remaining charges from Indictment No. 16-1012. Two counts of the Aggravated Vehicular Homicide, the count of Driving While Impaired by the Combined Influence of Alcohol and Any Drug, and the No Seat Belt violation– labeled counts three, six, fifteen, and eighteen in the indictment, respectively –had been dismissed prior to the start of trial.  *Compare* SR 162-72, *with* T 78-143.

[2] Following the parties' opening statements, the trial court dismissed the charge Refusal to Submit to a Chemical Test, charged as "count nineteen" in the Indictment.  T 188-89; *see also* SR 171.

Shoemaker testified he and Sharpley arrived at the camp grounds around 1:00 p.m. and remained on the camp site for a "[c]ouple [of] hours" with "[Petitioner] and a couple other people that [Shoemaker] did not know."  T 240-41.  Thereafter, Shoemaker recalled he, Sharpley, Petitioner, and one other individual went down to the river to drink and catch crayfish.  T 241-42.  Shoemaker testified some of the individuals consumed shots of Capitan Morgan, explaining "[he] and [Sharpley] had a couple shots and [Petitioner] had a shot, too."  T 242.  Shoemaker stated Petitioner also consumed a drink from a "glass bottle[,]" perhaps "a Corona or something."  T 243-44.  Shoemaker stated they did not eat any food by the river, but he and Sharpley smoked marijuana both by the river and at the campsite.  T 244-45.

Around approximately 4:00 or 5:00 p.m., Shoemaker "wanted to go to the store" to purchase "more beer and . . . [c]igarettes[,]" so he spoke with Sharpley and Petitioner.  T 245-47.  Shoemaker explained he "knew [he] wasn't going to drive and definitely wasn't going to let [Sharpley] drive [be]cause [they] consumed the same amount of alcohol" and Sharpley felt intoxicated, but Petitioner "[s]aid he was okay to drive[.]"  T 246.  Accordingly, the three boarded the vehicle; "[Petitioner] drove . . . [Sharpley] sat in the back behind [Petitioner]" and Shoemaker "s[at] in the front passenger seat[;]" then headed towards "The Country Store on 66."  T 246-47.

Carl Coons was camping at Kinyon's Canyons on July 27, 2015, at a campsite adjacent to Petitioner's.  T 214-17.  Coons testified he met two others that day, "Chris and Will[,]" in passing.  T 218.  Coons stated Petitioner asked him if he needed anything from the store, then boarded a "dark-colored sedan."  T 220-23.  Coons explained

"Chris had gotten in the back seat, Will was in the passenger['s seat in the] front, and [Petitioner] was in the driver's seat."  T 222-23.

Coons testified the store was located approximately five miles from the camp grounds.  T 222.  Shoemaker explained that, to get to the store, Petitioner would make a left turn out of the camp grounds onto Old Route 66; then turn right onto Route 20; continue on Route 20 until the intersection with Route 66 North; and make a left turn at said intersection.  T 247-50.  Investigator Altieri testified: Route 20 ran east and west; Route 66 ran north and south; both streets contained two lanes, one for travel in each direction; and the speed limit on both roads was fifty-five miles per hour.  T 1064-65.

On the drive to the store, Shoemaker testified Sharpley "had his head out the window[.]"  T 251.  As Petitioner approached the turn onto Route 66, Shoemaker felt him "[l]et off the gas" then accelerate in order to "make the left-hand turn . . . [to] cross the lane of traffic" traveling in the opposite direction.  T 254-55.  "As [Petitioner] was making the turn, [Shoemaker] looked back to look at [Sharpley]; and when [Shoemaker] turned around[,]" the vehicle "made contact with [another] car, or hit it[.]"  T 255-26.

Melanie Andrews was driving home from work with her husband on July 27, 2015, shortly before 5:30 pm. on Route 20 when her attention was drawn to a "passenger waiving" from "the back of the car on the driver's side" of the "black Nissan Altima" driving "directly behind [her]."  T 300-05.  Andrews testified the vehicle had turned onto Route 20 behind her.  T 303.  Andrews stated the vehicle "followed [her] for a few miles . . . driving sort of back and forth on the yellow line."  T 304.  Andrews explained "[t]hey were driving sort of erratically back and forth between the white and the yellow line, [and] at some points did go over the white line a little bit."  T 305.

6

Andrews further testified "[t]hey were tailgating [her] car and sort of ping-ponging back

and forth between the lines[,]" at times coming so close to Andrews' vehicle that she

"couldn't see . . . the hood[, only] . . . their windshield."  T 306.  Andrews recalled the

Nissan Altima continued to tailgate her vehicle, despite her acceleration from the speed

limit of fifty-five miles per hour to sixty-five.  T 305-06.

Andrews testified she "wanted to get off the road" because she "was afraid that

they were going to drive into the back of [her] car" so she instructed her husband to "call

911."  T 307.  Before her husband could place the call, Andrews testified she "could see

the wheel crank, and the[ Altima] turned" left to get onto Route 66 North.  T 308.

Andrews recalled she "was able to observe through [her] rear view mirror the impact

with the other vehicle[,]" a blue Nissan car.  T 308.  After observing the impact,

Andrews' husband called 911; Andrews parked her vehicle and spoke to the 911

operator; and Andrews approached the accident scene.  T 313.  Andrews observed a

man "sitting on the guardrail in front of the vehicle" whom she identified as Petitioner.  T

314-15.

Terry Metcalf testified he was driving home from work around 5:30 p.m. on July

27, 2015, traveling westbound on Route 20 in his Nissan Versa.  T 356-57.  Metcalf

testified he had been driving at a speed of fifty-five miles per hour, but slowed down to

"about 45 miles per hour" as the vehicle in front of his slowed down to make a turn, then

"started to accelerate" but "collided" with another vehicle, "a dark sedan[,]"

approximately a few "seconds later[.]"  T 360-62.  Metcalf explained the collision

occurred "right at the intersection" and that he "was traveling in the westbound lane

[when] the other vehicle entered [his] lane."  T 362.  Metcalf recalled he "observed an

7

individual sitting on the guardrail . . . having a cigarette" while Metcalf was trapped in his vehicle, and identified Petitioner as the individual.  T 367-68.  Metcalf testified emergency personnel responded to the scene "no[] more than ten minutes" after the collision.  T 365.

Shortly before 5:30 p.m. on July 27, 2015, Frederick Jacob exited the Country Store located on Route 66 and started driving home, then "heard tires screeching and [a] crash[.]"  T 327-29.  Jacob parked his vehicle in a driveway then walked "towards where the crash was" where he observed Petitioner "squeezing out of the driver's door" of a black car.  T 333-35.  Jacob testified Petitioner apparently sustained no injuries, so he turned to the driver of the other vehicle, a blue car, and reported the driver's injuries to a 911 call operator.  T 336-37.  When Jacob returned to the black car, he "looked in the back seat and saw a guy with his face down in a pool of blood[.]"  T 337.

Cherie Kreutziger, a firefighter EMT, testified she responded to a two car accident near the intersection of Route 20 and Route 66 on July 27, 2015.  T 433-40. Kreutziger stated she first encountered "a patient in the back seat" of one of the cars, whom she later learned to be Sharpley, but was unable to find a pulse.  T 441-43.  Next, Kreutziger "heard a patient screaming across the street" and ran to aid the individual, whom she knew to be Shoemaker.  T 444.  Kreutziger later turned to the second vehicle, which contained Metcalf, ensured Metcalf could breathe, then returned to Shoemaker.  T 445-46.  After Shoemaker was loaded into an ambulance, Kreutziger testified she was directed "to go to another patient" because Petitioner "was arguing with the people who were trying to take care of . . . [and] assess him."  T 450-51.

Kreutziger recalled Petitioner "said he was not driving the vehicle" and that "he had not been drinking" but "did smell of alcohol." T 453-54.

EMT Joseph Kozloski responded to the scene in "the last ambulance to arrive" and was assigned Petitioner, whom Kozloski had known for ten years at the time of trial, as a patient. T 472, 475-76. Kozloski recalled "[t]he first thing [Petitioner] said . . . was, 'I was not driving[.]'" T 480. Kozloski testified he observed Petitioner "did have an odor of alcohol[.]" T 482. Kozloski stated Petitioner was acting "[i]ncoherent, [exhibited] slurred speech . . . [and] didn't want to sit still[;]" therefore, Kozloski assessed Petitioner for signs of a head injury but found no indications of such an injury. T 485-86.

Heather Orvis, a paramedic, was also dispatched to a motor vehicle accident where she encountered an individual whom she identified as Petitioner "back boarded and collared" in an ambulance. T 508, 515. Orvis explained Petitioner's vital signs were within the normal limits, but Petitioner "was not cooperative" and "did smell of alcohol[.]" T 522-24. Orvis further described Petitioner as "belligerent" and recalled he "started to become belligerent" the minute she attempted to provide care. T 525.

New York State Police Trooper Kevin Holohan testified he was called to respond to a two-car head-on collision at the intersection of Routes 20 and 66 at approximately 5:30 p.m. on July 27, 2015. T 536-41. Holohan arrived on the scene within ten minutes of the call and observed "a black Nissan . . . in the middle of Route 20 . . . [with] extensive front end damage" and approximately "40 yards [away,] . . . a blue Nissan" which also appeared to have "sustained some extensive front end damage[.]" T 542-43. Holohan stated the black Nissan Altima was registered to Sharpley. T 546-47.

After assisting EMT Kreutziger's attempt to rescue Sharpley, Holohan spoke to Shoemaker, who was seated in the grass approximately "45 feet" away from the vehicle, then observed another "individual sitting . . . on the guide rail . . . no more than 15 feet away from the car."  T 543-52.  Holohan stated his first contact with this individual occurred "[a]t 6:10 p.m."  T 556.  The Trooper identified the individual as Petitioner and recalled Petitioner reported "he was in the back seat; and when the crash happened, he had to crawl out the front window."  T 553-55.

Holohan testified he "could detect the odor of an acholic beverage coming from [Petitioner's] breath[; Petitioner] had glassy eyes[; and Petitioner's] motor condition appeared to be impaired."  T 555.  When asked how much he had to drink, Petitioner "said that he had two Dos Equis and . . . one Bud Light in Kinderhook."  T 555.  During his conversation with Petitioner, which lasted approximately five to ten minutes, Holohan further observed Petitioner's "speech [w]as slurred[.]"  T 557-58.  Petitioner also told Holohan "he got ejected" from the vehicle "and flew all the way over" to the guide rail where he had been seated.  T 559.

Holohan stated Petitioner was placed on a "back board . . . laying down facing up" and a "neck collar" was applied.  T 570.  Holohan administered a standardized field sobriety test, the results of which indicated Petitioner was intoxicated.  T 571-82.

Petitioner was placed in an ambulance with two EMS workers and Holohan to be transported to the Albany Medical Center.  T 583.  Petitioner told paramedics "'I'm not as drunk as I usually am," and . . . 'I've never been involved in an accident . . . where I was in the back seat and had to crawl out the front window.'"  T 560, 584.  Petitioner

later said "'[they] were going to the store to buy beer'" and that he had been "'ejected'" but was "'fine.'"  T 585.

Based on his observations, Holohan "placed [Petitioner] under arrest and read him his DWI refusal warnings" at "6:50 p.m."  T 587.  After being asked whether he would "submit to a chemical test for the purpose of determining the alcohol and/or drug content of [his] blood[,]" Petitioner answered "'[n]ot without my attorney . . . present'" then asked "'[w]hy am I answering these questions when I was in the back seat?[.]'"  T 590.  Holohan read Petitioner his *Miranda* warnings.  T 591.

Holohan described Petitioner's behavior on the way to the medical center as "uncooperative . . . belligerent . . . [and] obnoxious."  T 593.  The ambulance arrived at the hospital "sometime after 7:10 p.m." and Petitioner refused to have his blood drawn twice; therefore, Holohan contacted Investigator Scott Schriner to obtain a court order.  T 594-95.  Holohan read Petitioner the DWI refusal warnings two additional times, then allowed Petitioner to make a phone call after his fourth refusal.  T 597-98.

Investigator Schriner subsequently arrived at the hospital with a police issued blood kit and signed court order.  T 599-600.  Medical staff assisted with the blood draw process and R.N. Shannon Dujack collected a blood sample at 9:44 p.m.  T 599-603; *see also* T 655-65 (testimony of Shannon Dujack); T 815 (Scott Schriner testifying "[Petitioner's] blood was drawn at 9:44.").

Michael Altieri testified he was assigned to investigate a motor vehicle accident on July 27, 2015, in his capacity as a New York State Police Collision Reconstruction Unit member.  T 1057-64.  The investigator presented a diagram depicting his reconstruction of the collision to the jury and explained: "Metcalf [wa]s in the Nissan

11

Versa traveling westbound. The Nissan Altima [wa]s traveling eastbound and abruptly made a left turn onto Route 66 without notice and a front end or angled front end collision occur[ed]."  T 1056-1147.  The impact occurred in "[t]he westbound lane" of Route 20.  T 1217.

Altieri utilized mathematical formulas to calculate the speed at which the vehicles were traveling prior to the collision and concluded "[t]he Nissan Altima [driven by Petitioner] was going 42 miles per hour at the point of impact . . . [and t]he Nissan Versa [driven by Metcalf] was going 55 miles per hour at the point of impact."  T 1134-35. Additionally, data from the Nissan Altima's "airbag control module" confirmed the vehicle was traveling at "42 miles per hour" at the time of the impact and "[t]he steering input . . . indicated a negative 270 degree turn at impact, which would indicate an abrupt left turn" had been made.  T 1138.

Altieri testified he observed no skid marks at the scene related to the crash, which indicated "[t]here was no pre-impact breaking at all be either vehicle."  T 1123. The investigator stated data from the Nissan Altima indicated the breaks had been activated five seconds prior to the crash, slowing the vehicle's speed from "50 to 49" miles per hour, then again two seconds prior to the crash, but once the vehicle reached a speed of "42 miles per hour," the steering wheel was turned and "there was no braking."  T 1218-20; *see also* T 1190-92.  Finally, Altieri offered an opinion as to the cause of the crash, explaining:

> [T]he Nissan Versa was traveling westbound on Route 20, had no time to or did not see a hazard, while the Nissan Altima was traveling eastbound and made an [ab]rupt left turn failing to yield the right-of-way in front of the Nissan Versa causing a crash while he crossed the westbound lanes of traffic to travel north on[to] Route 66.

T 1146-47.

Carrie Kirkton testified she worked in the toxicology section of the New York State Police Forensic Investigation Center.  T 926.  Kirkton identified a record for Petitioner's laboratory case which contained a blood sample collected with a New York State Police Laboratory kit.  T 937-43.  Kirkton testified she performed two blood alcohol analyses on the sample.  T 944, 951-52.  The first analysis of the blood sample revealed "a .1408 percent ethanol content" and the second revealed "a .1400 percent ethanol content."  T 954-55.

Kirkton explained "[a]lcohol . . . is a central nervous system depressant" which "has significant effects on an individual's ability to balance . . . psychomotor skills."  T 955.  Considering Petitioner's "drinking history, . . . weight," and the amount of "time that ha[d] passed between [the accident and] the actual blood draw," Kirkton conducted a series of "ethanol calculations or extrapolations" to determine the ethanol content of Petitioner's blood at the time of the crash.  T 961-65.  Kirkton determined that, at the time of the crash, "[t]he range was between a .178 percent to a .235 percent ethanol content."  T 965.  Finally, Kirton opened "it was not likely" that "a male, approximately [6'2" tall] and weighing approximately 165 pounds . . . found to have a blood alcohol content of .14 percent and known to [have] be[en] drinking beer and one Captain Morgan shot" to have had a blood alcohol content "below a .08 percent at the time of the crash" when he "had not had anything to drink" in the prior "approximately four hours[.]"  T 966.

Dr. Michael Sikirica testified he conducted an autopsy of Cristopher Sharpley in his capacity as the Rensselaer County Medical Examiner.  T 1225-28.  Dr. Sikirica

explained Sharpley's cause of death was "severe skull fractures and brain injuries due to blunt force trauma" and that Sharpley's injuries were consistent with having been involved in a high-speed collision.  T 1240.

Dr. Richard Uhl testified he worked as an orthopedic surgeon for the Albany County Medical Center, where he had provided treatment to Terry Metcalf from July 27, 2015, to the time of trial.  T 1264-72.  Dr. Uhl explained Melcalf sustained "very serious injuries" which required continuing treatment and testified he had performed four surgeries on Metcalf.  T 1267-72.

The People rested their case and defense counsel moved for a trial order of dismissal for each of the remaining counts.  T 1274, 1279-98.  Rensselaer County Court reserved on the motion.  T 1306.

### 2.  Defense Case

Marilyn Ginger testified she worked as a registered nurse in the Albany Medical Center trauma unit.  T 1330.  Ginger stated she treated Metcalf during the night shift on August 3, 2015.  T 1333-34.  Between 5:00 and 5:30 a.m., Ginger observed a change in Metcalf's vital signs; therefore, she gave the patient medication and a cup of water.  T 1334-35.

Ginger testified that when "[Metcalf] was holding the water cup . . . his hand was shaking."  T 1335.  Ginger explained the "pronounced" hand shaking could be considered "an alcohol withdrawal sign," so she "asked [Metcalf] if he had any history of drinking" and Metcalf told Ginger "he drank five drinks a week."  T 1335-36.  At the conclusion of Ginger's testimony, the defense rested its case.  T 1358.

### 3.  Summations, Charges, Deliberation, and Verdict

14

After resting the defense case, Rensselaer County Court conducted a charge conference, during which it dismissed two of the Aggravated Vehicular Homicide counts as multiplicitous.  T 1358-60.  Following the conference, the trial court provided pre-summation instructions to the jury; Petitioner's attorney delivered the defense summation; and the A.D.A. gave the People's summation.  T 1372.  Rensselaer County Court next instructed the jury on the remaining twelve charges and the jurors began deliberations.[3]  T 1485-1580.  The jury returned a verdict of guilty as to all twelve counts. T 1642-52.

### D.  Sentencing

On April 17, 2017, Petitioner reappeared before Rensselaer County Court for sentencing.  *See generally*, T 1671-96.  The People requested imposition of the maximum sentence, defense counsel made a statement on Petitioner's behalf, and Petitioner spoke thereafter.  T 1687-91.

Rensselaer County Court sentenced Petitioner to an indeterminate term of eight and one third to twenty-five years imprisonment for his conviction on count one,

---

[3] In its jury instruction, Rensselaer County Court renumbered the remaining counts.  Therefore, the charge of Aggravated Vehicular Homicide, charged as "count two" in the indictment, was labeled "count one."  T 1506; *see also* SR 162-63.  The other count of Aggravated Vehicular Homicide, charged as "count five" in the indictment, was labeled "count two."  T 1513; *see also* SR 164-65.  The count of Vehicular Manslaughter in the First Degree, charged as "count seven" in the indictment, was labeled "count three."  T 1522; *see also* SR 165-66.  The charge of Aggravated Vehicular Assault, charged as "count eight" in the indictment, was labeled "count four."  T 1528; *see also* SR 166.  The charge of Vehicular Assault in the First Degree, charged as "count nine" in the indictment, was labeled "count five."  T 1538; *see also* SR 166-67.  The charge of Manslaughter in the Second Degree, charged as "count ten" in the indictment, was labeled "count six."  T 1546; *see also* SR 167.  The charge of Assault in the Third Degree, charged as "count eleven" in the indictment, was labeled "count seven."  T 1552; *see also* SR 167-68.  The charge of Reckless Driving, charged as "count twelve" in the indictment, was labeled "count eight."  T 1555; *see also* SR 168.  The first count of Driving While Intoxicated, charged as "count thirteen" in the indictment, was labeled "count nine."  T 1557; *see also* SR 168-69.  The second count of Driving While Intoxicated, charged as "count fourteen" in the indictment, was labeled "count ten."  T 1563; *see also* SR 169.  The charge of Failure to Yield, charged as "count sixteen" in the indictment, was labeled "count eleven."  T 1568; *see also* SR 170.  The charge of Moving from Lane Unsafely, charged as "count seventeen" in the indictment, was labeled "count twelve."  T 1569; *see also* SR 170-71.

aggravated vehicular homicide.  T 1691.  County Court imposed a second indeterminate

term of eight and one third to twenty-five years for Petitioner's second aggravated

vehicular homicide conviction, to run concurrently with the sentence imposed on the first

count.  T 1691.  County Court also sentenced Petitioner to indeterminate terms of– five

to fifteen years imprisonment for count three, vehicular manslaughter in the first degree;

five to fifteen years imprisonment for count four, aggravated vehicular assault; two and

one third to seven years imprisonment for count five, vehicular assault in the first

degree; and five to fifteen years for count six, manslaughter in the second degree –and

ordered each sentence to be served concurrently with the sentences previously

imposed.  T 1691-93.  For Petitioner's convictions on count seven, assault in the third

degree, and count eight, reckless driving, County Court imposed sentences of one year

in the county jail, to be served concurrently with the sentences imposed on counts one

through six.  T 1693.  County Court next ordered three-year conditional discharges for

Petitioner's two driving while intoxicated convictions under counts nine and ten.  T 1693-

94.  County Court also imposed fines for Petitioner's convictions on counts eleven and

twelve for failure to yield and moving from lane unsafely, respectively.  T 1694-95.

### E.  Post-Judgment Motion

Petitioner filed a Motion to Vacate his conviction in Rensselaer County Court

pursuant to C.P.L. § 440.10.  *See* SR 1, Notice of Motion, SR 2-4, Affidavit in Support of

Motion, SR 5-10, Memorandum of Law in Support of Motion, SR 11-31, Exhibits.[4]

Petitioner alleged trial "counsel never told [Petitioner] that if convicted at trial, [Petitioner]

could end up spending 8 1/3 to 25 years in prison, nor did cou[nsel] proper[ly] advi[s]e

---

[4] *See generally*, C.P.L. § 440.10.

[Petitioner on whether] to accept or reject the [P]eople's plea offer" but, "had [Petitioner] known that he could end up spending 25 years in prison, he would definit[]ely accepted the [P]eople's plea offer of 5 to 15 [years]."  SR 3-4.

The People opposed the Motion.  *See* SR 32-42, Affirmation in Opposition to Motion to Vacate, SR 43-47, Exhibit.  The People submitted an affirmation from the attorney who represented Petitioner at trial wherein counsel stated "[Petitioner]'s claim that I did not advise him about his maximum [sentencing] exposure of twenty-five years is patently untrue."  SR 47.

Rensselaer County Court denied the Motion.  SR 48-51, Decision and Order (dated May 12, 2020).  The trial court held "a hearing [wa]s not justified" and Petitioner's claims "ha[d] no legal merit."  SR 49.

Petitioner sought leave to appeal the trial court's denial of his post-conviction motion to the Appellate Division.  SR 52-54, Leave Application and Supporting Affirmation.[5]  On June 26, 2020, the Third Department granted Petitioner's leave application and consolidated the matter with Petitioner's then-pending direct appeal of his judgment of conviction.  SR 107.

**F.  Direct Appeal**

Petitioner appealed his judgment of conviction to the Appellate Division, Third Department.  *See* SR 108-348, Petitioner's Brief to the Appellate Division and Appendix. As relevant here, Petitioner argued: (1) the evidence supporting his conviction was legally insufficient and the jury's verdicts were against the weight of the evidence (SR 129-35); (2) various counts should be dismissed as lesser included offenses of other

---

[5] *See generally*, C.P.L. § 460.15.

counts (SR 136-41); and (3) the trial court erred in denying Petitioner's request to charge lesser included offenses for Aggravated Vehicular Homicide (SR 142-44). Following the denial of his Motion to Vacate, Petitioner added Rensselaer "County Court erred in denying [his] CPL § 440.10 Motion . . . without first conducting a hearing."  SR 355; *see generally*, SR 349-421, Petitioner's Brief to the Appellate Division and Appendix.  The People agreed the five counts challenged by Petitioner as inclusory concurrent charges should be dismissed, but opposed Petitioner's claims concerning the weight and sufficiency of the evidence, the trial court's refusal to charge lesser included offenses for Aggravated Vehicular Homicide, and the trial court's denial of Petitioner's post-conviction motion without a hearing.  *See* SR 422-652, the People's Appellate Division Brief and Appendix.

The Appellate Division dismissed the counts charging Vehicular Manslaughter in the First Degree, Reckless Driving, Driving While Intoxicated, and Vehicular Assault in the First Degree and vacated the sentences imposed thereon and affirmed Petitioner's judgment of conviction as to the remaining counts.  *See People v. Ferguson*, 193 A.D.3d 1253, 1260 (3rd Dept. 2021).[6]  As discussed in greater detail below, the Third Department found: Petitioner's arguments that his convictions were unsupported by legally sufficient evidence and against the weight of the evidence were "unpersuasive[;]" the trial court "did not err in denying" Petitioner's lesser included offense charge request; and "County Court did not abuse its discretion in denying [Petitioner]'s CPL 440.10 motion without a hearing."  *Id*. at 1254-60.

---

[6] A copy of the Third Department's Memorandum and Order affirming Petitioner's conviction is included in the State Court Record. *See* SR 653-662.

Petitioner sought leave to appeal the Third Department's decision to the Court of Appeals. SR 663-64, Leave Application. On June 30, 2021, the Court of Appeals denied Petitioner's application for leave. *People v. Ferguson*, 37 N.Y.3d 964 (2021).[7]

## III.   PETITION

Petitioner challenges his 2017 judgment of conviction for two counts of Aggravated Vehicular Homicide, Aggravated Vehicular Assault, Manslaughter in the Second Degree, Assault in the Third Degree, Failure to Yield, and Moving from Lane Unsafely, following jury trial in Rensselaer County Supreme Court. *See generally*, Pet. Petitioner avers he is entitled to federal habeas relief because: (1) the evidence supporting his convictions was legally insufficient and the jury's verdict was against the weight of the evidence (Pet. at 5-7); (2) five counts should be dismissed as lesser included offenses (Pet. at 7-8); (3) the trial court's refusal to instruct and charge the jury on lesser included offenses as requested was improper (Pet. at 8-10); and (4) trial counsel failed to adequately advise him about his maximum sentencing exposure if convicted at trial (Pet. at 10-11). Respondent contends: (1) Petitioner's weight of the evidence claim is not cognizable on habeas review and the Appellate Division reasonably rejected Petitioner's legal sufficiency claim (Dkt. No. 13 at 18-29); (2) Petitioner's second claim is moot (Dkt. No. 13 at 29-30); (3) Petitioner's jury charge claim is not cognizable on habeas review and meritless (Dkt. No. 13 at 30-32); and (4) Petitioner's ineffective assistance claim is unexhausted, but should be dismissed as plainly meritless (Dkt. No. 13 at 32-41).

## IV.   DISCUSSION

---

[7] A copy of the Court of Appeals' Order denying leave is included in the State Court Record. *See* SR 665.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks and citation omitted).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

## A.  Legal Sufficiency and Weight of the Evidence

Petitioner first avers he is entitled to federal habeas relief because "the evidence was legally insufficient and the jury's . . . verdict[] w[as] against the weight of the evidence[.]"  Pet. at 5-7.  Respondent contends Petitioner's weight of the evidence claim is not cognizable on habeas review and the Third Department reasonably rejected Petitioner's legal sufficiency claim.  Dkt. No. 13 at 18-29.

Where a federal habeas petitioner claims he has been convicted in a state court on insufficient evidence, "the relevant question is whether, after viewing the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979). However, "the argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus[.]" *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (citing *Estelle*, 502 U.S. at 67-68) (additional citations omitted); *see also Gethers v. Superintendent*, No. 9:18-CV-1262 (BKS/DJS), 2021 WL 7161870, at *2 (N.D.N.Y. Aug. 17, 2021) ("[w]hile arguments as to the legal sufficiency of evidence are cognizable in federal court under habeas corpus review, 'weight of the evidence' arguments are founded in New York Criminal Procedure Law § 470.15(5), and thus are not cognizable.") (citations omitted), *report and recommendation adopted*, 2022 WL 122778 (N.D.N.Y. Jan. 13, 2022). Accordingly, Petitioner's weight of the evidence claim provides no basis for federal habeas relief; however, Petitioner's legal sufficiency claim is assessed below.

In determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, "federal courts must look to state law for 'the substantive elements of the criminal offense,' . . . but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). The Supreme Court has explained that challenges to the sufficiency of the evidence following conviction:

> [F]ace a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational

21

> trier of fact could have agreed with the jury." . . . [S]econd, on
> habeas review, "a federal court may not overturn a state court
> decision rejecting a sufficiency of the evidence challenge
> simply because the federal court disagrees with the state
> court. The federal court instead may do so only if the state
> court decision was 'objectively unreasonable.'"

*Id*. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559

U.S. 766, 773 (2010))).

On direct appeal, the Third Department concluded Petitioner's convictions were

supported by legally sufficient evidence, explaining:

> Testimony regarding [Petitioner]'s erratic driving, together
> with the evidence of [Petitioner]'s intoxication and blood
> alcohol content hours after the collision, the speed at which
> [Petitioner] made the left-hand turn without braking and
> [Petitioner]'s failure to yield to oncoming traffic provided a
> valid line of reasoning and permissible inferences from which
> the jury could conclude that [Petitioner] engaged in reckless
> driving and, as a result of intoxication, operated the vehicle in
> manner that caused the death of his passenger and serious
> physical injury to the driver of the oncoming vehicle[.]

*Ferguson*, 193 A.D.3d at 1257 (citations omitted).  This Court is unable to conclude the

Appellate Division's conclusion was unreasonable.

### 1.  Aggravated Vehicular Homicide

Petitioner was charged with and convicted of two counts Aggravated Vehicular

Homicide, in violation of P.L. § 125.14(3) and (5).  *See* SR 162-65; T 1642-43.  Under

New York Law,

> A person is guilty of aggravated vehicular homicide when he
> or she engages in reckless driving as defined by [V.T.L. §
> 1212], and commits the crime of vehicular manslaughter in
> the second degree as defined in [P.L. § 125.12], and either:
> (3) has previously been convicted of violating any of the
> provisions of [V.T.L. § 1192] within the preceding ten years[;
> or]

(5) causes the death of one person and the serious physical
injury of at least one other person[.]

P.L. § 125.14.  "Reckless driving" is defined as "driving or using any motor vehicle . . . in
a manner which unreasonably interferes with the free and proper use of the public
highway, or unreasonably endangers users of the public highway."  V.T.L. § 1212.

First, there was sufficient evidence from which a reasonable jury could have
found that Petitioner engaged in reckless driving.  New York's highest court has
explained "'reckless driving' . . . means the running or operation of an automobile under
such circumstances as to show a reckless disregard of the consequences."  *People v.
Grogan*, 260 N.Y. 138, 143 (1932).  The People presented a volume of evidence at trial
from which a fact finder could conclude Petitioner's operation of the Nissan Altima from
Kinyon's Canyons camp ground to the intersection of Routes 20 and 66, the location of
the head-on collision impact, reflected a reckless disregard of the consequences.

"The voluntary use of alcohol or drugs before driving may be considered as a
factor in the reckless driving analysis[.]"  *People v. Goldblatt*, 98 A.D.3d 817, 819 (3rd
Dept. 2012).  The People's evidence established Petitioner was intoxicated when he
drove Sharpley's Nissan Altima.  Shoemaker testified Petitioner had "a shot" and at
least one other beverage prior to driving.  T 242-44.  Three emergency medical workers
who responded to the scene of the collision observed Petitioner smelled of alcohol.  T
454, 482, 522-24.  Trooper Holohan also smelled the odor of alcohol on Petitioner;
observed other evidence of intoxication including slurred speech, impaired motor
functioning, and glassy eyes; and administered a field sobriety test which Petitioner
failed.  T 555-59.  Petitioner also admitted he consumed three beverages and told
paramedics that he was not "as drunk" as he usually was.  T 555-60.  A toxicologist

23

concluded Petitioner's blood alcohol level was between ".178" and ".235" percent at the time of the head-on collision.  T 965.

Andrews described Petitioner's driving in the moments prior to the collision as "erratic[,]" explaining he had been "tailgating [her] car and sort of ping-ponging back and forth between the lines[,]" and traveling at a speed above the posted speed limit.  T 304-06.  Petitioner's argument, that his conduct in "tailgating Ms. Andrews['] vehicle and weaving back and forth prior to the accident is irrelevant[,]"[8] is unavailing.  *See*, *e.g.*, *Prudential Ins. Co. of Am. v. Govel*, No. 1:16-CV-0297 (LEK/DJS), 2017 WL 2455106, at *9 (N.D.N.Y. June 6, 2017) (explaining that "a defendant's conduct before the moment of [a] fatal crash" is relevant because "if [the] defendant was engaging in highly risky behavior for some period of time before the moments leading up to the accident, it is reasonable to infer that []he had some awareness of the riskiness of h[is] conduct at the moment of the crash[;]" however, "if there is no evidence that the defendant was engaging in dangerous behavior before the events immediately preceding the accident, a jury might well conclude that the crash was caused by a momentary lapse of judgment rather than the defendant's conscious disregard of a risk.").  Andrews' testimony about Petitioner's erratic operation of the vehicle could therefore be considered in the jury's assessment of whether Petitioner unreasonably interfered with the use of or endangered the users of the public highway.

A reasonable jury also could have concluded Petitioner's decision to cross the westbound lane of travel while that lane was occupied by Metcalf exhibited "a reckless disregard of the consequences."  *Grogan*, 260 N.Y. at 143; *see*, *e.g.*, *People v. Earley*,

---

[8] Pet. at 17.

121 A.D.3d 1192, 1193 (3rd Dept. 2014) (concluding a reconstruction investigator's testimony "that defendant crossed the center line and collided driver-side headlight to [driver-side] headlight with the oncoming vehicle[;]" the defendant's admission "that she had been drinking[;] and the arresting officer['s] testi[mony] that [the defendant] had glassy eyes, slurred speech and the odor of alcohol" supported the jury's conviction for reckless driving) (internal quotations omitted), *lv denied*, 25 N.Y.3d 1200 (2015). Metcalf's testimony, corroborated by collision reconstruction calculations, established Metcalf's vehicle was traveling westbound on Route 20 at the posted speed limit at the intersection with Route 66.  T 362, 1056-1135.  Petitioner accelerated the vehicle he was operating in the eastbound lane to make an "abrupt left turn" across westbound lane, without yielding to Metcalf.  T 254-55; 1138; 1217.

Petitioner avers his decision to turn into the lane of oncoming traffic was not reckless because "[i]t is questionable as to whether [Petitioner] actually had observed Metcalf's vehicle approaching in the opposite lane" and, "[e]ven if he had seen Metcalf's vehicle, [Petitioner] . . . merely was negligent in failing to yield the right of way before making the left turn[.]"  Pet. at 5.  Petitioner's argument is unsupported.  A jury could have found Petitioner had engaged in reckless driving based on *either* his entry into the lane which he saw Metcalf approaching in or his entry into the opposite lane of travel without regard for whether oncoming traffic was approaching.  *See People v. Bohacek*, 95 A.D.3d 1592, 1594-95 (2012) (concluding the defendant's conviction for reckless driving was supported by legally sufficient evidence where "the People established that the accident was caused by defendant's failure to keep right and that there was no evidence that the weather conditions, hydroplaning or any mechanical failure played

any role in the accident" because "the jury could reasonably infer that defendant, in reckless disregard of the consequences, ingested . . . drugs, drove her car across the center line of the highway and collided with decedent's vehicle[.]") (citations omitted); *People v. Lamphear*, 35 A.D.2d 305, 308-09 (3rd Dept. 1970) (explaining the defendant's conduct in driving at a speed above that which was permissible, and entry into another lane which was "not free of oncoming traffic[,]" without a clear view of what was ahead amounted to "reckless driving[.]").

In sum, testimony concerning Petitioner's conduct in operating a motor vehicle while intoxicated, erratic driving prior to the collision, and entry into a lane where oncoming traffic was traveling provided sufficient evidence from which a reasonable juror could conclude Petitioner engaged in reckless driving as defined by V.T.L. § 1212.

There was also sufficient evidence from which a reasonable jury could conclude Petitioner committed vehicular manslaughter in the second degree.[9]  "A person is guilty of vehicular manslaughter in the second degree when he or she causes the death of another person, and" as relevant here, "operates a motor vehicle in violation of [V.T.L. § 1192] . . . and as a result of such intoxication or impairment by the use of a drug . . . operates such motor vehicle . . . in a manner that causes the death of such other person[.]"  P.L. § 125.12(1).  Further,

> If it is established that the person operating such motor vehicle . . . caused such death while unlawfully intoxicated or impaired by the use of alcohol or a drug, then there shall be a rebuttable presumption that, as a result of such intoxication or impairment by the use of alcohol or a drug . . . such person operated the motor vehicle . . . in a manner that caused such death, as required by this section.

---

[9] In his Traverse, Petitioner argued "the People failed to prove . . . that, as a result of his intoxication, petitioner had operated the vehicle in a manner that caused [Sharpley's] death[.]"  Traverse at 8.

P.L. § 125.12; *see also* T at 1511-12 (Rensselaer County Court instructing the jury that "if the People prove beyond a reasonable doubt that [Petitioner] was operating a motor vehicle while unlawfully intoxicated or impaired by the use of alcohol and, while doing so, caused the death of another person, then" the members of the jury could, "but we[re] not required to[,] infer that as a result of such intoxication or impairment," Petitioner "operated the motor vehicle in a manner that caused the death of another person.").

Under V.T.L. § 1192, "[n]o person shall operate a motor vehicle" either "while such person has .08 of one per centum or more by weight of alcohol in the person's blood as shown by chemical analysis of such person's blood" or "while in an intoxicated condition."  V.T.L. § 1192(2)&(3).  The People presented sufficient evidence from which a reasonable factfinder could conclude Petitioner was unlawfully intoxicated at the time of the head-on collision, in violation of V.T.L. § 1192.  *See*, *e.g.*, T at 965-66 (Kirkton explaining Petitioner's blood contained "between a .178 percent to a .235 percent ethanol content" at the time of the crash and "it was not likely" that an individual fitting Petitioner's description could have had a blood alcohol content "below a .08 percent at the time of the crash[.]"); 582 (Holohan testifying Petitioner failed a field sobriety test at the scene of the crash, which indicated "[t]hat he[ was] intoxicated.").

Additionally, as a result of Petitioner's unlawful intoxication, the jury was entitled to presume Petitioner's intoxication caused Sharpley's death and; therefore, that Petitioner had committed vehicular manslaughter in the second degree.  *See People v. Serrano*, 196 A.D.3d 1134, 1136-37 (4th Dept. 2021) (rejecting the defendant's argument "that the verdict [wa]s against the weight of the evidence because the People failed to establish that . . . as a result of such intoxication or impairment [the defendant]

operated her vehicle in a manner that caused the victim's death" and affirming the jury's verdict as to the count of vehicular manslaughter in the second degree because "[t]he People established that defendant was intoxicated by presenting the testimony of a sheriff's deputy who . . . testified that he could smell alcohol on defendant's breath, [the defendant's] speech was slurred . . . [the defendant's] eyes were bloodshot and glassy, and" the defendant failed field sobriety tests; therefore, "statutory presumption" that as a result of intoxication, the defendant operated the motor vehicle in a manner that caused the victim's death "was properly applied[.]") (citations omitted), *lv. denied*, 37 N.Y.3d 1061 (2021), *reconsideration denied*, 38 N.Y.3d 930 (2022); *see also*, *e.g.*, *People v. Drouin*, 115 A.D.3d 1153, 1154-55 (4th Dept. 2014), *lv. denied*, 23 N.Y.3d 1019 (2014).

Concerning the count of Aggravated Vehicular Homicide *in violation of P.L. § 125.14(3)*– submitted to the jury as "count one" –Petitioner admitted he had been convicted of violating V.T.L. § 1192 within the preceding ten years.  SR 174-76; *see generally*, P.L. § 125.14(3).  Petitioner was convicted of Driving While Ability Impaired, in violation of V.T.L. § 1192(1) in Schodack Town Court and New Lebanon Town Court on October 15, 2014, and May 9, 2009, respectively.  SR 173-76.

With respect to the count of Aggravated Vehicular Homicide *in violation of P.L. § 125.14(5)*– submitted to the jury as "count two" –a reasonable jury could have found Petitioner "cause[d] the death of [Sharpley] and the serious physical injury of [Metcalf.]" P.L. § 125.14(5).  The statutory presumption that, as a result of his intoxication, Petitioner operated the motor vehicle in a manner that caused Sharpley's death is also applicable under P.L. § 125.14.[10]  In combination with the aforementioned evidence

---

[10] *See* P.L. § 125.14

from which a reasonable juror could concluded Petitioner operated a motor vehicle while unlawfully intoxicated, the presumption provided sufficient evidence from which a trier of fact could have found Petitioner caused Metcalf's injury and Sharpley's death beyond a reasonable doubt.

Accordingly, the Appellate Division's denial of Petitioner's legal sufficiency claim as to both counts of Aggravated Vehicular Homicide was not objectively unreasonable. *See Coleman*, 566 U.S. at 651.

### 2. Aggravated Vehicular Assault

Petitioner was also charged with and convicted of Aggravated Vehicular Assault, in violation of P.L. § 120.04(a)(3). *See* SR 166; T 1643. "A person is guilty of aggravated vehicular assault when he or she engages in reckless driving as defined by [V.T.L. § 1212], and commits the crime of vehicular assault in the second degree as defined in [P.L. § 120.03], and[,]" as relevant here, "has previously been convicted of violating any of the provisions of [V.T.L. § 1192] within the preceding ten years[.]" P.L. § 120.04-a(3).

Under New York law, "[a] person is guilty of vehicular assault in the second degree when he or she causes serious physical injury to another person, and[,]" as relevant here, "operates a motor vehicle in violation of [V.T.L. § 1192 (3)] . . . and as a result of such intoxication or impairment by the use of a drug . . . operates such motor

---

If it is established that the person operating such motor vehicle caused such death or deaths while unlawfully intoxicated or impaired by the use of alcohol or a drug, . . . then there shall be a rebuttable presumption that, as a result of such intoxication or impairment by the use of alcohol or a drug, . . . such person operated the motor vehicle in a manner that caused such death or deaths, *as required by this section and section 125.12 of this article*.

(emphasis added).

vehicle . . . in a manner that causes such serious physical injury to such other person[.]"

P.L. § 120.03(1).  As with the charges of Aggravated Vehicular Homicide and Vehicular

Manslaughter in the Second Degree, New York's statute for Vehicular Assault in the

Second Degree provides that:

> If it is established that the person operating such motor vehicle
> . . . caused such serious physical injury while unlawfully
> intoxicated or impaired by the use of alcohol or a drug, then
> there shall be a rebuttable presumption that, as a result of
> such intoxication or impairment by the use of alcohol or a drug
> . . . such person operated the motor vehicle . . . in a manner
> that caused such serious physical injury, as required by this
> section.

P.L. § 120.03(1).

As explained above, the People presented evidence from which a jury could find

Petitioner operated the motor vehicle while unlawfully impaired.  Additionally, as a

result, a presumption of causation was applicable here.  Moreover, for the reasons

previously stated, there was sufficient evidence from which a reasonable factfinder

could conclude Petitioner had engaged in reckless driving and had previously been

convicted of such a predicate offense.

Therefore, the Third Department's conclusion– that Petitioner's conviction for

Aggravated Vehicular Assault was supported by legally sufficient evidence –was not

unreasonable.

### 3.  Manslaughter in the Second Degree

Petitioner was further charged with and convicted of Manslaughter in the Second

Degree, in violation of P.L. § 125.15(1).  *See* SR 167; T 1644.  Under New York law, "[a]

person is guilty of manslaughter in the second degree when . . . He recklessly causes

the death of another person[.]"  P.L. § 125.15(1).

30

> A person acts recklessly with respect to a result or to a circumstance . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

P.L. § 15.05(3).

Here, there was sufficient evidence from which a reasonable factfinder could conclude Petitioner consciously disregarded a substantial and unjustifiable risk by: erratically driving a motor vehicle on Route 20 over the speed limit, while intoxicated, and failing to yield as he crossed the westbound lane of travel, making an abrupt left hand turn, which caused a head-on collision with another vehicle, without any evidence of pre-impact braking –which amounted to a gross deviation from the standard of conduct a reasonable person would observe.  *See*, *e.g.*, *People v DeLong*, 269 A.D.2d 824, 824-25 (2000), *lv denied*, 94 NY2d 946 (2000) (the evidence was sufficient to support a conviction of manslaughter in the second degree where "defendant was driving erratically at an excessive rate of speed on a two-lane suburban road in a highly intoxicated condition" and "neither applied the brakes nor attempted to steer the vehicle to avoid the impact" prior to striking the victim); *People v. Reichel*, 110 A.D.3d 1356, 1363-64 (3rd Dept. 2013) (concluding the evidence was sufficient to conclude the "defendant recklessly caused the victim's death" citing the defendant's conduct in driving a vehicle after "a day of heavy drinking" which traveled over the "posted speed limit" then "without any evidence of braking—struck a tree" and upholding the jury's verdict convicting the defendant of manslaughter in the second degree).

31

To the extent Petitioner's intoxication may have affected his perception or nonperception of the risk of harm,[11] "such intoxication would not reduce the defendant's culpability; [because] voluntary intoxication constitutes reckless conduct[.]"  *People v. Bruno*, 127 A.D.3d 1101, 1102 (2d Dept. 2015) (citing *People v. Walker*, 58 A.D.2d 737, 738 (4th Dept. 1977)).  Accordingly, the Appellate Division's rejection of Petitioner's challenge to the legal sufficiency of his conviction for Manslaughter in the Second Degree was not unreasonable.

### 4.  Assault in the Third Degree

Petitioner was additionally charged with and convicted of Assault in the Third Degree, in violation of P.L. § 120.00(2).  *See* SR 167-68; T 1644.  "A person is guilty of assault in the third degree when . . . He recklessly causes physical injury to another person[.]"  P.L. § 120.00(2).

A reasonable jury could have concluded Petitioner recklessly caused physical injury to Metcalf in the same manner he recklessly caused Sharpley's death.  Therefore, the Appellate Division's denial of Petitioner's legal sufficiency claim as to the count of Assault in the Third Degree was not unreasonable.

In sum, a reasonable trier of fact could have found the essential elements of Aggravated Vehicular Homicide, Aggravated Vehicular Assault, Manslaughter in the Second Degree, and Assault in the Third Degree beyond a reasonable doubt.  *Jackson*, 443 U.S. at 309.  Because Petitioner has failed to demonstrate the state courts'

---

[11] *See People v. Licitra*, 47 N.Y.2d 554, 559 (1979) (explaining, concerning the "defendant's subjective awareness and conscious disregard of the risk . . . it is [the] 'defendant's perception or nonperception of the risk of harm' which is controlling.").

conclusion– that the jury's verdict was supported by legally sufficient evidence – was unreasonable, federal habeas relief is not warranted.  *Coleman*, 566 U.S. at 651.

### B.  Dismissal of Lesser Included Offenses

Petitioner next argues relief is warranted because "counts three, five, eight, nine and ten should be dismissed as lesser included offenses[.]"  Pet. at 7-8.  Respondent avers because the Appellate Division dismissed the charges at issue on direct appeal, Petitioner's identical argument in the instant petition is moot.  Dkt. No. 13 at 29-30.

On direct appeal, Petitioner argued "counts three, five, eight, nine and ten should be dismissed as lesser included offenses of other counts[.]"  SR 136-41.  Petitioner asserted, *inter alia*,

> Vehicular manslaughter in the first degree, [as charged in count three,] reckless driving, [as charged in count eight,] and driving while intoxicated, as charged in count ten, are lesser included offenses of aggravated vehicular homicide, as charged in count one[;] . . . [c]ount five, charging [Petitioner] with vehicular assault in the first degree, must be dismissed as a lesser included offense of aggravated vehicular assault [as charged in count four; and] . . . count nine, charging [Petitioner] with driving while intoxicated pursuant to [P.L.] §§ 1192(2) and 1193(1)(c), must be dismissed as a lesser included offense of aggravated vehicular assault [as charged in count four.]

SR 138-40.[12]  In response, the People stated Petitioner's argument was "unpreserved for appellate review" but "agree[d] that these counts should be vacated and dismissed in light of [Petitioner's] convictions for greater offenses[.]"  SR 453.[13]

---

[12] In his brief to the Appellate Division, Petitioner referred to the charges as they were numbered by Rensselaer County Court at trial and submitted to the jury, rather than as numbered in the Indictment.
[13] The People's Brief to the Appellate Division referenced the counts as numbered by the trial court, in the same manner as Petitioner.

The Appellate Division agreed, holding Petitioner's "convictions for vehicular manslaughter in the first degree, reckless driving and driving while intoxicated under counts 7, 12, 13 and 14 of the indictment must be dismissed as inclusory concurrent counts of his convictions for aggravated vehicular homicide" and Petitioner's "conviction for vehicular assault in the first degree under count 9 of the indictment must be dismissed as an inclusory concurrent count of aggravated vehicular assault[.]" *Ferguson*, 193 A.D.3d at 1257 (citations omitted). Accordingly, the Third Department dismissed the charges for the counts presented to the jury as three, eight, nine, ten, and five. *See id.*; *compare* SR 162-72, Indictment, *with* T 1506-71, Rensselaer County Court Instructing the Jury on the Renumbered Counts.

In sum, the Appellate Division has already granted the relief Petitioner now seeks. Accordingly, this claim is moot and no further relief is warranted. *See, e.g.*, *Taplin v. Rabideau*, No. 9:04-CV-0935 (FJS/RFT), 2008 WL 2559374, at *16 (N.D.N.Y. June 23, 2008) ("[s]ince the state court already vacated Petitioner's conviction on count four of the indictment and dismissed it, Petitioner's habeas claim with regard to that count is moot.") (citing *Delgado v. Duncan*, No. 1:02-CV-4929, 2003 WL 23185682, at *5 (E.D.N.Y. Nov. 4, 2003) (additional citations omitted); *Rodriguez v. Vance*, No. 1:12-CV-5418, 2015 WL 5172899, at *5 n. 3 (S.D.N.Y. Sept. 3, 2015) ("[Petitioner] raised this claim on his direct appeal and the Appellate Division granted the relief sought . . . Therefore, the claim is moot and the Court will not review it here.") (citation omitted).

### C. Lesser Included Offense Jury Instruction

Petitioner next contends "County Court improperly declined to grant [Petitioner]'s request to charge lesser included offenses[.]" Pet. at 8-10. Respondent avers this

claim is not cognizable on habeas review and, in any event, is meritless.  Dkt. No. 13 at
30-32.

On direct appeal, Petitioner argued Rensselaer "County Court improperly
declined to grant [Petitioner]'s request to charge [the] lesser included offenses" of
Vehicular Manslaughter in the First Degree and Driving While Intoxicated "for
Aggravated Vehicular Homicide[.]"  SR 142-44.[14]  The Appellate Division held:

> Although vehicular manslaughter . . . and driving while
> intoxicated . . . are lesser included offenses of aggravated
> vehicular homicide . . . , [t]here [wa]s no reasonable view of
> the evidence from which to conclude that [Petitioner] did not
> engage in reckless driving . . . so as to support a finding that
> he committed vehicular manslaughter in the first degree and
> driving while intoxicated but not aggravated vehicular
> homicide . . . [; therefore, the trial court] did not err in denying
> [Petitioner]'s request to charge vehicular manslaughter in the
> first degree and driving while intoxicated as lesser included
> offenses of aggravated vehicular homicide.

*Ferguson*, 193 A.D.3d at 1258 (citing *People v. Nisselbeck*, 85 AD3d 1206, 1208 (3rd
Dept. 2011)) (additional citations omitted).

The Supreme Court has not determined whether due process requires a trial
court to charge a jury with a lesser included offense in a non-capital case.  *Beck v.
Alabama*, 447 U.S. 625, 638, n.14 (1980) (expressly reserving the question of whether
due process requires a state court to charge lesser included offenses in non-capitol
cases); *see also*, *e.g.*, *Smith v. Barkley*, No. 9:99-CV-0257 (GLS), 2004 WL 437470, at
*5 (N.D.N.Y. Feb. 18, 2004).  "[B]ecause no clearly established Supreme Court
precedent requires a trial court to provide a lesser included jury charge, [P]etitioner . . .
cannot establish that the Third Department's rejection of this claim was either contrary

---

[14] Petitioner solely cited N.Y. statutory and case law in support of his claim.  SR 142-44.

to or an unreasonable application of Supreme Court precedent." *Acevedo v. Superintendent*, No. 9:16-CV-0594 (LEK/DEP), 2018 WL 1326080, at *7 (N.D.N.Y. Feb. 16, 2018) (citing *Gibson v. Artus*, No. 9:04-CV-0820 (LEK), 2008 WL 9434482, at *10 (N.D.N.Y. Mar. 21, 2008), *aff'd*, 407 Fed. App'x 517 (2d Cir. 2010)).  In other words, Petitioner's claim that the state court "err[ed] by not including a lesser included offense instruction in this, a non-capital, case is not legally cognizable" on federal habeas review. *Ross v. Conway*, No. 9:08-CV-0731 (TJM/DEP), 2010 WL 5775092, at *11 (N.D.N.Y. Dec. 6, 2010), *report and recommendation adopted*, 2011 WL 484199 (N.D.N.Y. Feb. 7, 2011); *see also*, *e.g.*, *Gibson*, 2008 WL 9434482, at *10 (collecting cases).

Accordingly, Petitioner is not entitled to relief on this claim. *See*, *e.g.*, *Smith*, 2004 WL 437470, at *5-6.[15]

### D.  Ineffective Assistance of Trial Counsel

Finally, Petitioner argues "defense counsel's fail[ed] to advise [him] about his sentencing exposure or to accept or reject the plea offer[.]"  Pet. at 10-11.  Respondent contends Petitioner failed to properly exhaust state court remedies with respect to this claim, nevertheless, dismissal is warranted because it is plainly meritless.  Dkt. No. 13 at 32-41.

It is well established that "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies[.]"  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing 28 U.S.C. § 2254(b)(1)).  In order to do so, the "state prisoner[] must

---

[15] Because Petitioner's claim concerning the trial court's refusal to charge lesser included offenses presents no basis upon which federal habeas relief could be granted, the Court need not address Respondent's additional argument that the trial court's failure to provide the requested charge did not violate N.Y. law.

give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Put another way, "the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (citing *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995)) (additional citation omitted).

As explained above, Petitioner presented this claim– that trial counsel's failure to advise him on the People's plea offer deprived him of the effective assistance of counsel –in a post-judgment motion pursuant to C.P.L. § 440.10.  *See generally*, SR 1-31, Petitioner's Motion to Vacate and Supporting Documents.  After Rensselaer County Court denied Petitioner's Motion, the Appellate Division granted Petitioner leave to appeal said denial with his direct appeal.  SR 107.  However, Petitioner did not argue the merits of his ineffective assistance claim to the Third Department, rather, Petitioner argued Rensselaer County Court erred in denying his C.P.L. § 440.10 Motion without a hearing.  *See* SR 355-57 (arguing "a question of fact exist[ed] as to whether [trial counsel] actually had informed [Petitioner] about his maximum sentencing exposure . . . Accordingly, County Court should not have denied [Petitioner]'s motion without first conducting a hearing.").  Indeed, the Appellate Division addressed Petitioner's claim as raising an issue of state procedural law.  *See Ferguson*, 193 A.D.3d at 1260 (holding "County Court did not abuse its discretion in denying [Petitioner]'s CPL 440.10 motion without a hearing.").

Therefore, Respondent argues Petitioner's claim in this action– alleging ineffective assistance of counsel based on counsel's failure to advise him on the plea offer –is unexhausted.  Dkt. No. 13 at 32-34.  Respondent also states the claim "does not appear to be procedurally defaulted" because Petitioner "conceivably could file a second [Motion pursuant to] CPL § 440.10 raising the claim."  *Id.* at 34.[16]  Petitioner contends his ineffective assistance claim was fairly presented to the Appellate Division; therefore, it is neither unexhausted nor procedurally defaulted.  Traverse at 9-16.

However, under § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  This is particularly true where the claim is plainly meritless.  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Accordingly, for the reasons explained below, this Court denies Petitioner's ineffective assistance of counsel claim irrespective of whether the claim was properly exhausted by Petitioner's consolidated appeal and, if not, whether the claim could properly be deemed procedurally barred for federal habeas purposes.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (explaining that "the procedural-bar issue . . . ordinarily should be" resolved first, but addressing the merits is appropriate where the underlying issues "[a]re easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *Boddie v.*

---

[16] In support of this conclusion, Respondent cites to *Lewis v. Lee*.  Dkt. No. 13 at 34 (citing No. 1:11-CV-7119, 2012 WL 6700045, at *5 (S.D.N.Y. Dec. 19, 2012)).  In that case, the Southern District of New York observed "there is no limit on § 440.10 motions" therefore, the petitioner's unexhausted ineffective assistance of counsel claims were not "procedurally barred."  *Lewis*, 2012 WL 6700045, at *5.  However, the Court further observed "[e]ven though [the petitioner]'s claims [we]re not exhausted and" the Southern District of New York could not deem the claims "procedurally barred yet," the petitioner "should be aware that if he were to bring a second § 440.10 motion, a state judge could find [he] had defaulted on these claims for not bringing them in the first § 440.10 motion[.]"  *Id.*

*New York State Div. of Parole*, 288 F. Supp. 2d 431, 439 (S.D.N.Y. 2003) ("in habeas corpus cases, potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit.") (internal quotations and citation omitted).

To demonstrate he was denied the effective assistance of counsel, Petitioner was required to prove that: (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish that counsel's performance was deficient, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688). To demonstrate counsel's deficient performance prejudiced his defense, "a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694). As Rensselaer County Court explained in denying Petitioner's post judgment motion, Petitioner has failed to make both showings as required by *Strickland*. *See* SR 49-50.

The Sixth Amendment right to the effective assistance of counsel extends to the plea-bargaining process. *Lafler*, 566 U.S. at 162 (citing *Missouri v. Frye*, 566 U.S. at 144-45 (2012)) (additional citations omitted). Therefore, counsel has "a constitutional duty to give" the defendant "professional advice on the crucial decision of whether to accept a plea offer[.]" *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (citing *Boria v. Keane*, 99 F.3d 492, 498 (2d Cir. 1996)). "[C]ounsel must communicate to the

defendant the terms of [a] plea offer . . . and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed[.]" *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (first citing *Cullen v. United States*, 194 F.3d 401, 404 (2d Cir. 1999); then citing *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998)); *see also Frye*, 566 U.S. at 145 ("as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused.").

Here, Petitioner has not alleged counsel failed to communicate the People's offer of a plea, explain the terms of said plea, or discuss with Petitioner the strength of the People's case. *See generally*, Pet. at 10-11, Traverse at 9-16.[17]  Rather, Petitioner

---

[17] Petitioner appears to suggest in his Traverse that counsel did not inform him of the People's offer of a plea proposal. *See* Traverse at 13 ("Here, defense counsel did not communicate any formal offers to petitioner. As a result of that deficient performance, any offer lapsed.").  However, any such claim is belied by the record. *See* SR 13-14

| | |
|---|---|
| The Court: | And I believe there has been an offer extended to resolve this matter . . . |
| [A.D.A.]: | That's correct, Your Honor. |
| The Court: | What is the offer? |
| [A.D.A.]: | . . . Your Honor, the offer has been a plea to what would be Count 7, vehicular manslaughter in the first degree, a Class C felony, with a sentence agreement of five to 15 years in State Prison, as well as [a] Waiver of Appeal. |
| The Court: | Have you discussed that with your client? |
| [Defense Counsel]: | I have, Your Honor, and he respectfully rejects. |
| The Court: | Is that correct, [Petitioner]? |
| [Petitioner]: | Yes, ma'am. |

Therefore, to the extent Petitioner contends counsel's performance was deficient because counsel failed to inform him of an offer made by the People, relief is not warranted. *See, e.g.*, *Dunn v. Senkowski*, No. 9:03-CV-0364 (NPM), 2007 WL 2287879, at *10 (N.D.N.Y. Aug. 7, 2007) ("Petitioner's current, unsupported habeas claim that his attorney wrongfully induced [him] to plead guilty . . . which cannot be reconciled with the statements made both to and by him . . . not afford this Court a basis for granting petitioner's request for relief.") (citing *Blackledge v. Allison*, 431 U.S. 63, 73 (1977)) (additional citations omitted); *Santone v. Fischer*, No. 9:04-CV-0947 (NAM/DRH), 2010 WL 4702448, at *11 (N.D.N.Y. Sept. 13, 2010) (concluding the petitioner failed to satisfy *Strickland*'s first prong, noting "[defense counsel] conveyed the offer and its terms, as expressed to the Court in the pretrial matters, which remained unopposed by [the petitioner] who was available and able to comment on the plea negotiations.") (citation

avers defense counsel "did not accurately explain" Petitioner's "sentencing exposure and [the fact that Petitioner] faced the possibility of a[n] 8 1/3 to 25 year sentence if he was convicted at trial[.]"  Pet. at 10.

Rensselaer County Court concluded "[Petitioner]'s attorney's affirmation definitively demonstrates that [Petitioner] was advised numerous times of the maximum sentence which [Petitioner] faced should he lose at trial."  SR 50.[18]  The state court's conclusion– that defense counsel had advised Petitioner about his maximum sentencing exposure if convicted at trial –is entitled to deference.  28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a State court shall be presumed to be correct. The [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *see also*, *e.g.*, *Munck v. Amoia*, No. 9:16-CV-0118 (GLS), 2016 WL 4275737, at *4 (N.D.N.Y. Aug. 12, 2016) (explaining the state trial court's rejection of the petitioner's C.P.L. § 440.10 motion without a hearing pursuant to pursuant to C.P.L. § 440.30 was "entitled to AEDPA deference[.]"); *Tenace v. Senkowski*, No. 9:03-CV-0900 (LEK/VEB), 2007 WL 2874441, at *3 (N.D.N.Y. Sept. 27, 2007) (explaining the "presumption of correctness" contained in 28 U.S.C. § 2254(e)(1) "applies to findings by both state trial and appellate courts.") (citing *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir. 2001); *Whitaker v. Meachum*, 123 F.3d 714, 715 n. 1 (2d Cir. 1997)).

---

omitted), *report and recommendation adopted*, 2010 WL 4703396 (N.D.N.Y. Nov. 12, 2010), *aff'd*, 689 F.3d 138 (2d Cir. 2012).

[18] *See also* SR 44-47, Defense Counsel's Affirmation (wherein counsel affirmed: (1) "[a]dvising [Petitioner] of his maximum sentencing exposure is not something that I would have neglected to do . . . Nor is it something that I would have only done once[;]" (2) "not only was [Petitioner] made aware of his maximum exposure, he was hellbent on exercising his constitutional right to trial–regardless of his maximum exposure[;]" and (3) "[Petitioner]'s claim that I did not advise him about his maximum exposure of twenty-five years is patently untrue.").

Petitioner has failed to provide "clear and convincing evidence" to rebut the state court's conclusion that he was "advised numerous times" on his sentencing exposure. Instead, Petitioner repeats the self-serving assertion that defense counsel "did not accurately explain" the maximum sentence Petitioner could face if convicted at trial. *See* Pet. at 10.  Petitioner's self-serving, post-conviction claim, without more, is insufficient to demonstrate counsel's performance was deficient.  *See Gluzman v. United States*, 124 F. Supp. 2d 171, 177 (S.D.N.Y. 2000) (explaining "courts have been skeptical of accepting a defendant's self-serving, post-conviction statements that he would have pleaded guilty[.]") (citations omitted).

Petitioner argues the record lacks proof that counsel informed him of his maximum sentencing exposure if convicted at trial, citing trial counsel's affirmation that he routinely advises clients of their maximum sentencing exposure, but Petitioner's argument is unpersuasive.[19]  *See Berry v. Ercole*, No. 1:06-CV-6957, 2009 WL 1321906, at *7 (S.D.N.Y. May 12, 2009) (rejecting the petitioner's argument that counsel failed to adequately advise him of his maximum sentencing exposure, explaining "[w]hile [counsel] could not remember in 2008 and 2009"– at a post-conviction hearing –"the conversation in which he had informed [petitioner] in 2000 of his sentencing exposure, there is no reason that [counsel] would not have followed his customary practice in 2000 in this regard and advised [petitioner] of the sentencing

---

[19] *See* Traverse at 14 ("There is nothing in the record which proves counsel informed petitioner" of his maximum sentencing exposure if convicted at trial "and, even more importantly, counsel cannot specify any date or time in which he did inform petitioner of the maximum sentencing exposure" because defense counsel's affirmation "consisted solely of what he 'typically' and 'routinely' did with other clients [but, w]hat counsel did with other clients cannot be considered 'compelling circumstantial evidence to confirm' that he actually [so] informed [Petitioner]."); *see also* SR 45 (defense counsel affirming, *inter alia*, "I typically and routinely advise my clients of their maximum exposure to permit them an opportunity to make an independent determination as to whether to proceed to trial or to resolve their matter with a plea agreement.").

range for each top count."), *aff'd*, 391 F. App'x 87 (2d Cir. 2010).  Defense counsel's statements, coupled with the "strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance[,]" preclude this Court from disrupting Rensselaer County Court's conclusion that Petitioner "ha[d] failed to demonstrate that his attorney's performance fell below an objective standard of reasonableness[.]" *Strickland*, 466 U.S. at 689; SR 50.

Petitioner's related claim that "counsel failed to advise [him] concerning, [whether] to accept or reject the plea offer" is similarly insufficient to prove counsel's performance fell outside the range of professional reasonableness.  "[T]he ultimate decision whether to plead guilty must be made by the defendant."  *Purdy*, 208 F.3d at 45-46 (rejecting the petitioner's argument "that counsel not only must inform each client of the probable costs and benefits of accepting a plea offer, but also . . . advise the defendant to either plead guilty or not.") (citation omitted).  Therefore, to the extent Petitioner believes counsel's failure to direct him to accept the plea offer fell below an objective standard of reasonableness, he is incorrect.  *See id*. at 46 (holding "[defense counsel]'s decision to forgo specifically and explicitly telling [the petitioner] whether he should accept the government's plea offer was also within the range of professional reasonableness.").

Furthermore, to establish prejudice resulting from deficient representation in the context of a plea offer, petitioners must 'show the outcome of the plea process would have been different with competent advice.'"  *Smalls v. Kaplan*, No. 9:17-CV-0393 (TJM), 2018 WL 11473769, at *9 (N.D.N.Y. Jan. 2, 2018) (quoting *Lafler*, 566 U.S. at 163) (additional citations omitted).  Therefore, Petitioner was required to show a

reasonable probability that, but for counsel's deficient advice, he would have accepted the People's plea offer. *Lafler*, 566 U.S. at 168; *see also Frye*, 566 U.S. at 147 ("[t]o show prejudice . . . where a plea offer has . . . been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel.").

Here, Petitioner's contention that he would have accepted the People's plea offer had he received different advice is unpersuasive.  First, Petitioner's apparent desire to proceed to trial during pre-trial proceedings undermines his current claim that he would have pleaded guilty.  *See* SR 46 (defense counsel affirming Petitioner "was hellbent on exercising his constitutional right to trial"); SR 50 (Rensselaer County Court concluding, "[i]n light of the facts and circumstances of [Petitioner's] case," including trial counsel's statement that "[Petitioner] was 'hell-bent' on exercising his constitutional right to trial[,] . . . [Petitioner]'s self-serving post-conviction affidavit to the effect that he would have accepted a more favorable plea offer is rejected[.]") (citations omitted); *United States v. Frederick*, 526 F. App'x 91, 94 (2d Cir. 2013) (holding "it was not error . . . to conclude that there was no reasonable probability that additional information from [defense] counsel about the potential consequences of proceeding to trial would have changed [the defendant's] mind" in light of the defendant's "strong[] desire[] to proceed to trial[.]") (internal quotations omitted).  Additionally, Petitioner's protestations of innocence throughout the trial and at sentencing belie the argument that he would have pled guilty.  *See*, *e.g.*, T 1690 (at sentencing, Petitioner stated "I will miss [Chris Sharpley]. But my actions, my driving operation was not to blame for this, ma'am."); *Cullen v. United*

*States*, 194 F.3d 401, 407-08 (2d Cir. 1999) ("In determining whether [the defendant] has shown a reasonable probability that he would have accepted the plea bargain . . . the fact-finder will primarily have to make a determination of [his] credibility" and "would be entitled, but not required, to consider [the defendant]'s continued protestation of innocence as weighing against the credibility of his claim" that he would have plead guilty).

In sum, Petitioner is unable to prove his trial counsel's performance was deficient and that his defense was prejudiced as a result. Accordingly, Petitioner's ineffective assistance of trial counsel claim is plainly meritless; therefore, dismissal is warranted, irrespective of whether Petitioner's claim was properly exhausted in the state courts. *Gomez v. Miller*, No. 9:19-CV-1571 (TJM), 2021 WL 5446979, at *12 (N.D.N.Y. Nov. 22, 2021) (dismissing ineffective assistance of counsel claim, despite the petitioner's failure to argue the "exact issue" in state court, because "[u]nexhausted claims may be denied on the merits if the claims are 'plainly meritless' . . . or 'patently frivolous.'") (first quoting *Rhines v. Weber*, 544 U.S. 269, 277 (2005); then quoting *McFadden v. Senkowski*, 421 F.Supp.2d 619, 621 (W.D.N.Y. 2006); and then citing 28 U.S.C. § 2254(b)(2)).

V.   **CONCLUSION**

**WHEREFORE**, it is

**ORDERED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

ORDERED that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires; [20] and it is further

ORDERED that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

ORDERED that the Clerk shall serve a copy of this Memorandum-Decision and Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  November 2, 2023

Mae A. D'Agostino
U.S. District Judge

---

[20] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

46